[Cite as *State v. Mikhak*, 2026-Ohio-2106.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-36 |
| Appellee | : | |
| | : | Trial Court Case No. 2018 CR 0611 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| CHRISTOPHER A. MIKHAK | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 5, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

_____
MARY K. HUFFMAN, JUDGE

TUCKER, J., and EPLEY, J., concur.

RICHARD HEMPFLING, Attorney for Appellant
MEGAN A. HAMMOND, Attorney for Appellee

HUFFMAN, J.

{¶ 1} Christopher Mikhak appeals from the decision of the Greene County Common Pleas Court finding him to be a mentally ill person subject to hospitalization, terminating his conditional release, and remanding him to the Ohio Department of Mental Health, Summit Behavioral Healthcare Campus ("SBH"). In the absence of an abuse of discretion, the judgment of the trial court is affirmed.

**Procedural History**

{¶ 2} On August 17, 2018, Mikhak was indicted on two counts of aggravated burglary, two counts of felonious assault, two counts of abduction, and one count each of aggravated robbery, causing serious harm to a companion animal, and carrying a concealed weapon. All counts contained firearm specifications, and all but the carrying a concealed weapon count contained forfeiture specifications. Mikhak pleaded not guilty by reason of insanity on November 5, 2028.

{¶ 3} On December 6, 2018, defense counsel for filed a motion to determine Mikhak's competency to stand trial. On April 1, 2019, the State requested an evaluation of Mikhak's sanity at the time of the offense. The court granted the motions and ordered the evaluations. On June 12, 2019, after an evaluation, a report, and a hearing, the court found Mikhak competent to stand trial.

{¶ 4} After a jury trial, on November 8, 2019, Mikhak was found not guilty by reason of insanity on both counts of aggravated burglary, abduction, and aggravated robbery, as

2

well as causing serious harm to a companion animal, and not guilty of felonious assault and carrying a concealed weapon. On November 22, 2019, the State filed a motion for an evaluation under R.C. 2945.40, and the court granted the motion.

{¶ 5} On December 11, 2019, the court issued a judgment entry finding Mikhak to be a mentally ill person subject to hospitalization and presently in need of inpatient treatment, which was later amended on December 17, 2019. In its judgment entry, the court committed him to SBH, "the least restrictive commitment alternative consistent with public safety and the welfare of the Defendant."

{¶ 6} Over the next two and a half years, the court granted greater privileges to Mikhak; he received Level III privileges on April 8, 2020, Level IV privileges on March 11, 2021, and Level V privileges on December 22, 2021. Finally, on November 9, 2022, the court granted Mikhak conditional release to a group home managed by TCN Behavioral Health Services (TCN) as recommended by SBH. The court allowed Mikhak to leave the State for a trip to Washington, D.C., by entry on August 28, 2023. He was also given permission to travel to Florida on November 17, 2023, and December 12, 2024.

{¶ 7} On October 1, 2024, Mikhak filed a motion for independent living outside of the group home, attaching an opinion by his psychologist at TCN stating that he was ready to move into his own residence. The court denied the motion, finding that the "treatment provider for the defendant is not in agreement at this time." On December 9, 2025, the court ordered an evaluation regarding conditional release. Dr. Carla Dreyer of the Forensic Psychiatry Center for Western Ohio evaluated Mikhak and submitted a report on January 8, 2025. She concluded that Mikhak "is a mentally ill person subject to court order, although he is not an intellectually disabled individual subject to institutionalization." Dreyer found that the least restrictive setting was conditional release with his current group home placement.

{¶ 8} After defense counsel requested that Mikhak be reexamined, the court granted the motion on February 19, 2025. A forensic psychological evaluation was conducted by Dr. D. Richard Bromberg, Ph.D., on March 17, 2025. He recommended a series of successive steps in the group home setting with the ultimate goal of independent living.

{¶ 9} On April 4, 2025, Mikhak was taken into custody pursuant to R.C. 2945.402(C) for alleged violations of his conditional release plan. On the same day, the court ordered a mandatory evaluation pursuant to R.C. 2945.401 to take place on April 10, 2025, at the Forensic Psychiatry Center for Western Ohio.

{¶ 10} On April 14, 2025, Mikhak filed a motion for his release from jail to TCN on electronic home detention pending a decision by the court regarding the least restrictive setting. The court issued an entry sua sponte indicating that it was awaiting a report from the Forensic Psychiatry Center for Western Ohio, and it continued the ten-day period within which it was required to conduct a hearing to determine if Mikhak's conditional release should be modified or terminated. Dreyer conducted the examination, and in her April 30, 2025 report, she opined that "the least restrictive setting for Mr. Mikhak while under court jurisdiction is a state psychiatric hospital."

{¶ 11} At a May 1, 2025 hearing, both parties orally moved to continue the proceedings, and the court granted the motions. The court further issued an entry denying Mikhak's motion to be released from jail. On June 26, 2025, Bromberg submitted another report concluding that Mikhak's "current psychological and behavioral stability suggest that he remains capable of cooperating with his Conditional Release and capable of returning to the group home and continuing to move toward increased independence."

{¶ 12} The conditional release hearing occurred on June 27, 2025, at which Dreyer and Bromberg testified. Dreyer's April 30, 2025 report, and Bromberg's June 26, 2025 report

were admitted. The court's subsequent entry stated that Bromberg's April 5, 2025 report was provided by defense counsel. The court found Mikhak to be a mentally ill person subject to hospitalization under R.C. 2945.40(F) and presently in need of hospitalization. The court ordered that Mikhak be returned to jail for transport to SBH as soon as a bed became available. Mikhak timely appealed.

## Conditional Release Hearing

{¶ 13} Before addressing Mikhak's assigned errors, we review the transcript of the conditional release hearing on June 27, 2025. At the start thereof, the State and Defense counsel stipulated to the qualifications of Dreyer and Bromberg.

{¶ 14} Dreyer stated that she evaluated Mikhak on December 19, 2024, in response to his request to live independently because "the Court had conflicting information from providers at TCN about that." Her subsequent January 8, 2025 report recommended that Mikhak remain on conditional release. She stated that she evaluated him again while he was being held in jail in April 2025 "after a conditional release violation." She testified that at the time "there were concerns regarding his risk of violence in the community" based on "reports of him potentially threatening a woman" via text message. Dreyer stated that the woman called the group home twice about Mikhak, and there were further concerns that he was "not stable . . . given information from staff at the group home."

{¶ 15} Regarding the reported threats, Dreyer testified that Mikhak related to her that the woman involved was a prior girlfriend who was upset that he had ended their relationship and "was retaliating against him by reporting that he had threatened her." Dreyer testified that she tried repeatedly to obtain the text messages at issue but was unable to do so, and Mikhak refused to allow access to his phone. She described Mikhak as "very guarded" when describing his relationship with his prior girlfriend but said that he stated that he had provided

5

her with substantial financial support and purchased things for her. Dreyer characterized their relationship as "transactional."

{¶ 16} Dreyer testified that the reports of threats by Mikhak were further documented in Yellow Springs Police records. Her report reflects that her efforts to contact the alleged victim by means of a phone number contained in police records were unsuccessful. She testified that Mikhak indicated that he had been meeting the woman at "early morning hours" in Dayton, as early as 1:00 a.m., multiple times. According to Dreyer, when she advised Mikhak that he was not allowed to leave Greene County without the court's permission, he responded that because he is allowed to go to the Dayton VA Medical Center ("VA") for treatment, he "had some type of special permission to leave the county as he chose, particularly to go to Dayton." She stated that Mikhak's conditional release plan "clearly indicates that he has to have some type of special permission from the Court" to do so, but that he believed the condition did not apply to him.

{¶ 17} Regarding the concerns of staff about Mikhak's behavior at the facility, Dreyer testified that around the same time that the threats were alleged, there were reports of Mikhak "spending time by himself in a portion of the group home and appearing to respond to internal stimuli," or talking to himself, and that the staff found the behavior unusual. At the same time, Mikhak had been asking staff if they received any phone calls related to him, "which would suggest perhaps that he may have been anxious about that and that may have exacerbated the symptoms." Dreyer stated that Mikhak's primary diagnosis was schizoaffective disorder, bipolar type, which is a "mental illness that features symptoms of psychosis" and potential mood issues. She testified that responding to internal stimuli is suggestive of psychotic symptoms.

{¶ 18} Dreyer stated that Mikhak receives treatment from the VA, as a military veteran, and from TCN, but she had no documentation that the different agencies were communicating and coordinating his care. She testified that she suggested to Mikhak that he try to facilitate contact between his two providers, but he responded "that that was out of his hands." She stated that he was not involved in any individual or group treatment at TCN despite her repeated recommendations. In discussing such treatment with Mikhak, she stated that he "said he wasn't going to do it unless it was ordered by the Court."

{¶ 19} Dreyer testified that all of her reports reflect her concerns about Mikhak's "insight into his risk management needs" because he "has continually really minimized those and taken very little responsibility for managing some of these things." She opined that Mikhak needed additional services, especially in the absence of individual or group treatment. Dreyer stated that in her assessments of Mikhak, he was not forthcoming in response to questions related to his risk management needs and was unwilling to provide information.

{¶ 20} According to Dreyer, Mikhak struggled with being subject to his conditional release plan. She testified that he was once a very high functioning person, and he did not like to be under court supervision, which she described as a "blow to his ego." Dreyer stated that he resisted communication and had "a sense of entitlement at times in terms of what he believes he should be allowed to do," although he is well-educated, of above-average intelligence, and capable of following the conditional release plan. Dreyer testified that Mikhak "chooses to overlook things," and "sometimes, he is not as honest with people," such that staff were unaware that he was violating his conditional release plan by leaving the county.

{¶ 21} Dreyer testified that even if the alleged threats were found not to be legitimate, her recommendation that Mikhak return to SBH would remain unchanged. She stated that although she could not confirm the threats, in speaking to Mikhak, it became "very clear" that he was not honest with his treatment providers "about all of his activities in the community." According to Dreyer, Mikhak had been "engaging in risky behavior" in violation of his conditional release plan. She testified that Mikhak "doesn't understand how to have healthy relationships" and that he expressed his frustrations to her regarding the issue. Noting that Mikhak was in conflict with his former wife when he committed his offenses, Dreyer stated that she was concerned that Mikhak "would then continue to engage in problematic and unhealthy relationships where he is violating conditional release . . . and then also presenting with symptoms of mental illness." Dreyer opined that community placement was contraindicated "given his risk level . . . and his risk management needs." She stated that the safety of the community was "a primary concern."

{¶ 22} It was significant to Dreyer that Mikhak was found not guilty by reason of insanity but continued to contest the circumstances of his prior offenses, suggesting that he was not at fault. She stated that Mikhak related to her that "witnesses had agreements with each other," "there were conspiracies involving the police," and witnesses "did things to manipulate the crime scene." She testified that none of Mikhak's allegations were reflected in any of the materials provided to her about the offenses. According to Dreyer, Mikhak "had indicated repeatedly that he believes people are typically trying to get him. He has been very paranoid" while on conditional release. Dreyer opined that Mikhak would be able to return to conditional release after additional treatment and assessments.

{¶ 23} Bromberg testified that he was retained by defense counsel to evaluate Mikhak. He stated that he previously evaluated Mikhak on March 17, 2025, and then again

8

in June 2025. He stated that he compared the results of the testing, finding that the June results were "even more accurate," such that he was "getting an even better picture of Mr. Mikhak." According to Bromberg, in both tests, "there was no evidence of mental illness, significantly abnormal personality behavior, paranoid ideation, thought or mood disorder, or psychosis." He stated that Mikhak "actually had improved mental-health wise" since March 17, 2025, and had "increased self-insight."

{¶ 24} Bromberg stated that like Dreyer, he also did not review the text messages containing the alleged threat, but "[Mikhak] filled me in on that." Counsel for Mikhak then purportedly provided Bromberg the context surrounding the text messages at issue. Namely, Mikhak had broken up with his prior girlfriend because she was using drugs, and she was angry and threatened to tell the group home that he was leaving the county without permission. The following exchange then occurred at the hearing:

[Counsel for Mikhak]: Given that context, this is the following sentence [from Mikhak], "It would be a shame if your mom kicked you out of the house for doing drugs."

She then says, "LMAO. My mother knows everything I do, you idiot."

He then responds, "Do you really want a war with a bona fide[?]" [D]o you view that as a threat, in your opinion?

[Dr. Bromberg]: I do not.

**Assignments of Error**

{¶ 25} Mikhak asserts two assigned errors, which we consider together. He initially argues that the trial court's decision to terminate his conditional release was against the manifest weight of the evidence. Mikhak claims that the court "made no explicit finding" that he violated the terms of his conditional release, that his conditional release was revoked, or

9

that remand to SBH was the least restrictive placement alternative. According to Mikhak, the court's decision "was based entirely upon Dr. Dreyer's conclusions and opinions," which in turn were predicated "primarily, if not exclusively, on three concerns," namely the reported threats to the former girlfriend, the observation of Mikhak talking to himself in the facility, and Dreyer's "belief" that Mikhak's travels outside of Greene County constituted a violation of his conditional release.

{¶ 26} Mikhak notes that his prior girlfriend was never called as a witness, Dreyer never spoke to her directly, and Dreyer did not see the allegedly threatening message. Further, he asserts, no evidence was presented from the unnamed staff member who relayed the former girlfriend's report, and there was no testimony regarding how Dreyer obtained the information from the staff member or any evidence of the staff member's credibility. As to the alleged threat, Mikhak argues that a review of his text message "can in no way be construed as an actual threat of imminent harm."

{¶ 27} Regarding the observation of Mikhak talking to himself, he claims that again, there was no testimony from the reporting staff member, Dreyer did not testify that she spoke to the staff member directly, and no documentation was presented of the incident. Mikhak asserts that he uses earbuds when talking on his phone, which he argues is a valid alternative explanation for his conduct.

{¶ 28} Finally, Mikhak argues that his prior orders of conditional release specify that he cannot leave the *state* without permission. He asserts that the prosecutor never proffered any other order or document reflecting that he could not leave the county.

{¶ 29} In his second assignment of error, Mikak claims that the decision to terminate his conditional release was an abuse of discretion for the same reasons stated above. He claims that the court failed to "engage in any 'sound reasoning process,' as demonstrated

by its total lack of explanation for its decision," and that the decision "should be deemed arbitrary or unconscionable as well." According to Mikhak, "it does not appear that the Court considered less drastic measures, such as additional restrictions . . . or the several restrictions that were placed upon him on the previous three occasions when he was permitted to travel to other States." Finally, he claims that the court could have returned him to either the Level III, IV, or V status previously granted.

**Applicable Law**

{¶ 30} R.C. 2901.01(14) states: "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." Put differently, a not guilty by reason of insanity plea represents an acknowledgment of the commission of a criminal act along with a claim of non-responsibility due to a severe mental illness that prevented an understanding of wrongfulness.

{¶ 31} "R.C. 2945.401 provides a comprehensive scheme that gives Ohio trial courts continuing jurisdiction over the commitment of people committed to mental-health institutions by court order." *State v. Stutler*, 2022-Ohio-2792, ¶ 10. "R.C. 2945.401(A) and (J) provide that if a defendant in a criminal case is found not guilty by reason of insanity and then committed to a mental health institution, the defendant shall remain subject to the jurisdiction of the trial court until final termination of the commitment, which occurs through either early termination of the commitment by the trial court or the expiration of the maximum prison term that could have been imposed if the person had been convicted of the most serious offense charged." *Id.*

11

**{¶ 32}** R.C. 2945.402 states:

(C) A person, agency, or facility that is assigned to monitor a defendant or person on conditional release immediately shall notify the trial court on learning that the defendant or person being monitored has violated the terms of the conditional release. Upon learning of any violation of the terms of the conditional release, the trial court may issue a temporary order of detention or, if necessary, an arrest warrant for the defendant or person. Within ten court days after the defendant's or person's detention or arrest, the trial court shall conduct a hearing to determine whether the conditional release should be modified or terminated. At the hearing, the defendant or person shall have the same rights as are described in division (C) of section 2945.40 of the Revised Code. The trial court may order a continuance of the ten-court-day period for no longer than ten days for good cause shown or for any period on motion of the defendant or person. If the trial court fails to conduct the hearing within the ten-court-day period and does not order a continuance in accordance with this division, the defendant or person shall be restored to the prior conditional release status.

**{¶ 33}** R.C. 2945.402 further states:

(D) The trial court shall give all parties reasonable notice of a hearing conducted under this section. At the hearing, the prosecutor shall present the case demonstrating that the defendant or person violated the terms of the conditional release. If the court finds by a preponderance of the evidence that the defendant or person violated the terms of the conditional release, the court

may continue, modify, or terminate the conditional release and shall enter its order accordingly.

**{¶ 34}** The manifest weight of the evidence standard of review is distinct from the abuse of discretion standard; it involves weighing the evidence and determining whether the finder of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Terry*, 2024-Ohio-2935, ¶ 34 (2d Dist.)  "'A trial court's decision regarding a defendant's commitment pursuant to R.C. 2945.401 is reviewed on appeal for abuse of discretion.'" *State v. Smith*, 2017-Ohio-1439, ¶ 5, quoting *State v. Ortello*, 2016-Ohio-1441, ¶ 17 (7th Dist.), citing *State v. Jung*, 132 Ohio App.3d 369, 372 (6th Dist. 1999).

**{¶ 35}** "'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83 (1985). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id*. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.* We review Mikhak's arguments pursuant to the abuse of discretion standard of review.

**Analysis**

{¶ 36} In its brief, the State directs our attention to R.C. 2945.401(E),[1] asserting that the statute sets forth the relevant factors for the trial court's consideration. The statutory framework, however, distinguishes between different types of proceedings for persons found not guilty by reason of insanity, with the R.C. 2945.401(E) factors specifically limited to requests for nonsecured status or termination of commitment, while R.C. 2945.402 addresses the violation of conditional release conditions. R.C. 2945.401(E); *State v. Salvatore*, 2009-Ohio-2345, ¶ 20 (10th Dist.).

{¶ 37} The simple issue before the court was whether Mikhak violated the terms of his conditional release, and the record reflects that he did so. The court was not required to credit Bromberg's testimony but was free to evaluate the credibility of both witnesses.

{¶ 38} Regarding the alleged threats, although Dreyer and Bromberg did not review the text messages, the parties stipulated to their authenticity at the conclusion of the hearing, and they were admitted. When questioning Bromberg whether he perceived the text at issue

---

1. (E) In making a determination under this section regarding nonsecured status or termination of commitment, the trial court shall consider all relevant factors, including, but not limited to, all of the following:

(1) Whether, in the trial court's view, the defendant or person currently represents a substantial risk of physical harm to the defendant or person or others;

(2) Psychiatric and medical testimony as to the current mental and physical condition of the defendant or person;

(3) Whether the defendant or person has insight into the defendant's or person's condition so that the defendant or person will continue treatment as prescribed or seek professional assistance as needed;

(4) The grounds upon which the state relies for the proposed commitment;

(5) Any past history that is relevant to establish the defendant's or person's degree of conformity to the laws, rules, regulations, and values of society;

(6) If there is evidence that the defendant's or person's mental illness is in a state of remission, the medically suggested cause and degree of the remission and the probability that the defendant or person will continue treatment to maintain the remissive state of the defendant's or person's illness should the defendant's or person's commitment conditions be altered.

to be threatening, counsel omitted revealing portions of the exchange. Mikhak apparently promised his prior girlfriend that he would pay for her to attend a Sonic Temple concert with him and then refused to do so due to her drug use. On March 24, 2025, at 1:32 a.m., Mikhak advised her that he was ending their relationship and blocking her number based on concerns about her reaction. He texted, "I won't go to the club for a while because that is your workplace and I'll respect that." After Mikhak suggested she attend Narcotics Anonymous based on her drug use, she responded in part, "You met me in a strip club and payed me for sex and dates and now you're demanding I go to NA lmao." Just before the text exchange that was quoted to Bromberg in the above excerpt from his testimony, the prior girlfriend texted the following to Mikhak:

You can send me at least 1500 dude.

Who said anything about going crazy? I'm a stripper and I am used to this.

You're refusing to cooperate and making this worse just send me money and then I'll never speak to you again.

Idc if I see you at [C]heeks you're a customer, you pay girls for sex and company. It is what it is.

{¶ 39} Although the specific conditional release plan for Mikhak was not provided, we are confident that multiple trips to meet a stripper in the early morning hours were not permissible and that honesty by Mikhak to his treatment providers regarding his whereabouts was required. This conclusion is supported by Dreyer's testimony that Mikhak was not honest to staff regarding "all of his activities in the community" and that he engaged in "risky behavior" in violation of the conditional release plan.

15

**{¶ 40}** Regarding Mikhak's travel outside of Greene County, the court's most recent order of conditional release, dated March 7, 2024, stated: "1. The defendant shall remain on Conditional Release and will continue to comply with all conditions of the previously ordered Case Plan" and "[w]ill not leave the State unless the defendant has received prior approval." Although Mikhak is correct that the court's most recent order required prior approval to leave the state, but not the county, Dreyer expressed concern about Mikhak's activity while outside of the county. The gravity of the concern is made more plain given that while in Montgomery County, Mikhak engaged in a transactional relationship with an employee of a strip club and was not honest to staff about his whereabouts.

**{¶ 41}** Mikhak's conditional release violations were not limited to his activity in Montgomery County. Dreyer testified that she repeatedly advised Mikhak to engage in individual and group therapy, and he refused to do so unless it was court ordered. The most recent conditional release order, however, stated: "The defendant shall be required to attend regular group and individual therapy while under Conditional Release, with this treatment being used to assist him with dealing with changes in his functioning and life since his insanity acquittal, as well as assisting in his risk management needs." Accordingly, an explicit requirement of conditional release was violated as established in the record.

**{¶ 42}** As Dreyer noted, even in the absence of the alleged threat, Mikhak was subject to the termination of his conditional release. This result is supported by Dreyer's testimony regarding Mikhak's ongoing failure to take responsibility for his risk management needs, his "sense of entitlement in terms of what he believes he should be allowed to do," and his denial of responsibility for his felony offenses because he believed he had been wrongfully victimized. Regarding Mikhak's assertion that the court failed to consider less drastic measures than the revocation of judicial release, R.C. 2945.402 requires only that, upon a

finding by the preponderance of the evidence of a violation, the court "may continue, modify, or terminate the conditional release" and enter its order. Nothing else is required. Still further, despite Mikhak's argument, no specific findings, other than that sufficient proof by a preponderance of the evidence existed that he violated the conditions of conditional release, were required.

**{¶ 43}** An abuse of discretion is not demonstrated. Accordingly, Mikhak's assigned errors are overruled.

## Conclusion

**{¶ 44}** The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and EPLEY, J., concur.